**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

             Plaintiff,

vs.

JOSE AGUILAR BARRAZA, and
JUAN AGUILAR-BARRAZA
*aka* Juan Gabriel Aguilar,

             Defendants.

No. CR05-4040-MWB

**REPORT AND RECOMMENDATION
ON MOTIONS TO SUPPRESS**

––––––––––––––––

### *TABLE OF CONTENTS*

*I.*    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   **BACKGROUND FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

*III.*  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

     *A.*    *Search of Juan Incident to His Arrest* . . . . . . . . . . . . . . . . . . . . . . . **7**

     *B.*    *Juan's Pre-Miranda Statements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

     *C.*    *Search of the Blue Pickup Truck* . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

     *D.*    *Juan's Post-Miranda Statements* . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

     *E.*    *Search of Juan's Room* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

     *F.*    *Search of the Ford Ranger* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

     *G.*   *Search Warrant for the Aguilar House* . . . . . . . . . . . . . . . . . . . . . **35**

*IV.*  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

## I. INTRODUCTION

This matter is before the court on motions to suppress filed by the defendants on April 19, 2005. (Doc. Nos. 28 & 29) The plaintiff (the "Government") filed its resistance to the motions on May 4, 2005. (Doc. No. 34) Pursuant to the trial management orders filed in the case (Doc. Nos. 19 & 26), pretrial motions were assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition. Accordingly, the court held a hearing on the motions on May 4, 2005. Assistant U.S. Attorney Shawn Wehde appeared on behalf of the Government. The defendant Jose Aguilar-Barraza ("Jose") appeared in person with his attorney, R. Scott Rhinehart. The defendant Juan Aguilar-Barraza ("Juan") appeared in person with his attorney, Alexander M. Esteves.

At the hearing, the Government offered the testimony of Tri-State Drug Task Force Officers Tony Wingert, Elbert Andress, Mike Simons, and Dane Wagner. The following exhibits were admitted into evidence: **Gov't Ex. 1**, Affidavit of Task Force officer Chad Cleveland in support of criminal complaint against Jose Aguilar-Barraza (5 pages); **Gov't Ex. 2**, Affidavit of Task Force officer Tony Wingert in support of criminal complaint against Juan Aguilar-Barraza (5 pages); **Gov't Ex. 3**, video DVD of post-*Miranda* interview of Defendant Juan Aguilar-Barraza; **Gov't Ex. 4**, Search Warrant dated March 3, 2005, for search of defendants' residence at 1037 17th Street, Sioux City, Iowa, and supporting documentation (9 pages); **Gov't Ex. 5**, a large, hand-drawn exemplar of the area surrounding the defendants' residence. Also admitted into evidence were **Def. Exs. A-J**, ten photographs of the interior and exterior of the defendants' residence and the surrounding area; and **Def. Ex. AA**, a large, hand-drawn exemplar of the area. (Gov't Exs. 1 & 2 are attached to the Government's resistance, Doc. No. 34. All other exhibits are housed in the Clerk's file.)

After the hearing, Jose and Juan filed timely briefs on May 20, 2005 (Doc. Nos. 44 & 45), and the Government filed an untimely brief on May 23, 2005 (Doc. No. 46).

The court now turns to consideration of the defendants' motions to suppress.

## II. BACKGROUND FACTS

On March 1, 2005, officers of the Tri-State Drug Task Force in Sioux City, Iowa, arrested Leroy Eric McCoy on drug charges. McCoy agreed to cooperate with law enforcement. He identified an individual he knew as "Juan" as his source of supply for methamphetamine, and stated Juan's brother was his source of supply for cocaine. McCoy identified the house where Juan and his brother lived as a particular residence in Sioux City, Iowa (the "Aguilar house"). McCoy stated that during drug transactions, Juan and his brother drove a small blue car, a small blue pickup, or a white truck.

Officers set up surveillance at McCoy's apartment and at the Aguilar house. Then, in a recorded conversation, McCoy called Juan and ordered a half pound of methamphetamine. McCoy arranged for Juan to come to McCoy's apartment to make the delivery. Task Force officer Wingert drove McCoy to his apartment to identify "Juan." As they arrived, McCoy identified a man getting out of a light blue pickup parked directly across from McCoy's apartment building as Juan. The man approached the door to McCoy's apartment and knocked. When no one answered, the man started walking back toward his vehicle. Task Force officers then approached the man, identified themselves, took him the ground, handcuffed him, and placed him under arrest. The man later was identified as the defendant Juan Aguilar Barraza.

After the arrest, the officers moved Juan away from the apartment building and searched him incident to the arrest. During the search, Task Force Officer Andress asked

Juan if he had any weapons, guns, knives, needles, or drugs. Juan responded that there were drugs in his truck. Officer Andress asked him how much, and Juan responded "a half pound." Juan then was advised of his *Miranda* rights. Task Force officers searched the pickup and found a half pound of methamphetamine.

Other Task Force officers continued surveillance at the Aguilar house. Officer Simons was in a vehicle parked in an alley across the street from the residence when he was advised over the radio that a suspect had been arrested near McCoy's apartment, and the suspect was found to be in possession of drugs. A short time later, Officer Simons observed an Hispanic female come out of the Aguilar house and walk to a parking area behind and across the alley from the Aguilar house. Despite the cold weather, the woman was not wearing a jacket but only a short-sleeved shirt. The area where the pickup was parked was not part of the Aguilar homestead, but was private property where the Aguilars apparently had permission to park their vehicles. Officer Simons could see the front of a white Ford Ranger (the "Ford Ranger") that was parked in the parking area, and he previously had determined from the Ford Ranger's license plate that the vehicle was registered to Jose and Emma Aguilar. The Ford Ranger generally matched the description given by McCoy of one of the vehicles used by Juan and his brother to deliver drugs. In her right hand, the woman was carrying a plastic grocery sack containing a square object. Officer Simons lost sight of the woman when she got past the front of the Ford Ranger. Less than a minute later, she returned to the house without the sack.

After his arrest, Juan was taken to the Sioux City Police Department, where he again was advised of his *Miranda* rights. He then was questioned, and made numerous incriminating statements.[1] He stated the Aguilar house was his parents' house; he lived

---

[1] Gov't Ex. 3 is a video DVD of the entire interview.

in an upstairs bedroom in the house; and his brother, Jose, lived in the basement. He admitted there were drugs in his bedroom, and consented to a search of the bedroom.

Task Force officers then went to the Aguilar house and received consent from Juan's parents to enter the house to search Juan's room. During the search of Juan's bedroom, the officers found some white powder in a plastic bag. Upon this discovery, the officers stopped their search to seek a search warrant for the entire house.

When the officers first arrived at the Aguilar house to search Juan's room, Officer Simons walked to the parking area behind the house to look for the sack the female had carried out earlier. From his training and experience, Officer Simons suspected that when Juan had not returned from the delivery at the McCoy apartment, the female had removed drugs from the house to hide them in the Ford Ranger. Officer Simons looked in the window of the Ford Ranger and saw the grocery sack, which was empty, on the driver's seat, but nothing else. He then opened the driver's side door and looked under the seat where he saw, and then touched, a softball-sized round item wrapped in duct tape. From his training and experience, he recognized the package as likely containing illegal drugs. He then shut the door and called for a drug dog. When the drug dog arrived, it alerted on the driver's side door of the Ford Ranger. Officer Simons then opened the driver's side door again and picked up the round package. He also found a square box behind the driver's seat.

Later, Task Force officers obtained a State of Iowa search warrant authorizing the search of the entire residence. In the search warrant application, Task Force Officer Wagner stated the following:

> On 3-01-05 members of the Tri-State Drug Task Force arranged for a Hispanic male, later identified as Juan AGUILAR, to deliver a half pound of methamphetamine to the 600 Blk of 13th St. in Sioux City, Iowa. Juan AGUILAR

arrived in the 600 Blk of 13th Street and [was] found in possession of approximately a half pound of methamphetamine. Juan AGUILAR was placed under arrest and taken to the Sioux City Police Department to be interviewed. During the Interview Juan AGUILAR gave Task Force Officers consent to search his bedroom inside of [the Aguilar house] in Sioux City, Iowa. Officer[s] Wagner & Simons observed a female, later identified as Emma AGUILAR exit the [Aguilar house] carrying a box. Emma AGUILAR walked towards a Ford Ranger. Upon asking EMMA AGUILAR about taking the package to the pickup, she stated that her Brother in law Juan AGUILAR called her husband (Jose AGUILAR) and advised him to take the box to the truck. Upon a K-9 sniff of the vehicle, Officers located approximately one and a half pounds of an off-white substance in the truck. Upon a consent search of Juan AGUILAR's bedroom, officers located two plastic baggies containing a white powdery substance. This warrant is submitted to request permission to search the entire [Aguilar house]. Emma AGUILAR also stated that there is a handgun located in basement of [the Aguilar house] in Sioux City, Iowa.

During their search of the Aguilar house pursuant to the warrant, officers discovered a handgun, a substance used as a cutting agent for cocaine, drug notes, and a small amount of cocaine, all in Jose's room in the basement.

### III. ANALYSIS

Juan moves to suppress his statements made to law enforcement after he was taken into custody, but before he was advised of his *Miranda* rights, and all evidence flowing from those statements, including the evidence found in his truck when he was questioned, and the evidence found in the Ford Ranger located behind the Aguilar house. Jose moves to suppress the evidence found in the Ford Ranger and in the basement of the Aguilar house. Both defendants cite Fourth Amendment violations as grounds for their motions.

*See* Doc. Nos. 28, 29, 44, & 45. The Government resists the defendants' motions on all grounds. *See* Doc. Nos. 34 & 46.

The court will consider separately the legality of the searches of Juan's person, the blue pickup truck, Juan's room in the Aguilar house, the Ford Ranger, and the remainder of the Aguilar house; and the legality of Juan's pre-*Miranda* and post-*Miranda* statements.

### A. Search of Juan Incident to His Arrest

Juan was arrested as he was leaving McCoy's apartment, and then he was searched incident to that arrest. To determine whether the search was proper, the court first must determine whether there was probable cause to arrest Juan without a warrant, and then whether it was lawful to search him incident to the arrest.[2]

"In determining whether probable cause exists to make a warrantless arrest, the court looks to the totality of the circumstances to see whether a prudent person would believe the individual had committed or was committing a crime." *United States v. Segars*, 31 F.3d 655, 659 (8th Cir. 1994). "Reasonable suspicion" means "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995). The officer may consider all the evidence available to him, regardless of whether or not each component would support a finding of probable cause by itself. *See United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) ("A trained officer may properly infer from a collection of

---

[2]It is not clear from anything filed by Juan in this case that he is challenging his arrest or the search incident to the arrest. The failure to raise a suppression issue in a timely pretrial motion results in waiver of the issue under Federal Rule of Criminal Procedure 12(f). *United States v. Frazier*, 280 F.3d 835, 845 (8th Cir. 2002); *see United States v. Thompson*, 403 F.3d 533, 537 n.4 (8th Cir. 2005). Nevertheless, to provide a complete record for the district court, the court will address these issues.

circumstances, no one of which itself indicates illegal activity, that further inquiry is appropriate.")

In the present case, the court must determine from the totality of the circumstances whether a prudent officer would have believed Juan was engaging in criminal activity when he arrived at the McCoy apartment.

> [This] objective, reasonable-man test is appropriate because, unlike a subjective test, it "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question."

*Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317 (1984) (quoting *People v. P.*, 233 N.E.2d 255, 260 (1967)).

On March 1, 2005, officers arrested McCoy on drug charges, and he agreed to cooperate. He identified his source of supply for methamphetamine as Juan, made a telephone call to Juan to order a half pound of methamphetamine, and arranged for Juan to deliver the methamphetamine to his apartment. Juan then arrived at McCoy's apartment driving a pickup matching McCoy's description of a vehicle used by Juan to deliver drugs. When Juan got out of the pickup, he was identified by McCoy as one of his drug suppliers. Juan then approached McCoy's apartment and knocked on the door.

On these facts, a prudent officer reasonably could believe that Juan had arrived at McCoy's apartment to deliver methamphetamine. Accordingly, there was probable cause for the Task Force officers conducting surveillance at McCoy's apartment to believe that Juan was engaging in criminal activity. Therefore, the officers had the right to arrest him without a warrant, and to search his person incident to the arrest. *See United States v. Edwards*, 415 U.S. 800, 802-03, 94 S. Ct. 1234, 1236-37, 39 L. Ed. 2d 771 (1974) (warrantless searches incident to lawful custodial arrest are justified by reasonableness

of searching for weapons, instruments of escape, and evidence of crime). As the Eighth Circuit Court of Appeals held in *United States v. Pratt*, 355 F.3d 1119 (8th Cir. 2004):

> [I]f an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets. *United States v. Robinson*, 414 U.S. 218, 226, 236, 94 S. Ct. 467, 38 L. Ed.2d 427 (1973). A search incident to arrest is justified by the concern for officer safety and the need to collect evidence of the offense. *Id.* at 234. But, the presence of either justification need not be established in a particular case. That is, officers need not have any reason to think the individual is armed or that evidence of the crime will be found on his person. It is the fact of arrest that enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness. *Id.* at 235-36.

*Pratt*, 355 F.3d at 1121.

Under these standards, the search of Juan's person incident to his arrest was lawful.

### B. Juan's Pre-Miranda Statements

While Juan was being searched incident to his arrest, and before he was advised of his *Miranda* rights, he was asked by the arresting officer if he had any weapons, guns, knives, needles, or drugs. He responded that there were drugs in his truck. The arresting officer then asked him how much, and he responded "a half pound."

Generally, when a suspect is placed under arrest, an officer can ask questions connected with officer safety before conducting a search incident to the arrest. *See United States v. Lackey*, 334 F.3d 1224, 1226 (10th Cir. 2003) (applying the "public-safety" exception to *Miranda* from *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984), to questions about the presence of guns or sharp objects during

a search incident to an arrest); *see also United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992). Thus, the officer's questions here about weapons, knives, and needles were entirely proper. The officer had every reason to be concerned about placing his hands in pockets that might contain needles or weapons, and he was justified in asking about them. On the other hand, the officer's questions about drugs were not directed at officer safety, but were intended to illicit an incriminating response.

The Supreme Court long has recognized that custodial interrogations are inherently coercive. *See Dickerson v. United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 2331 (2000); *New York v. Quarles,* 467 U.S. 649, 654, 104 S. Ct. 2626, 2630, 81 L. Ed. 2d 550 (1984) (both citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). In *Miranda v. Arizona*, the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624.

"To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). These procedures include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26. If the suspect indicates in any manner prior to or during questioning that he wishes to remain silent or wants an attorney, any interrogation must cease. *Id.* at 473-74, 86 S. Ct. at 1627.

When Juan told the officers that he had drugs in his truck and the drugs weighed a half pound, he did so in response to police questioning while he was under arrest. At the time he made these statements, he had not been advised of his *Miranda* rights. The Government does not dispute these facts, but alleges that Juan's statements were spontaneous, volunteered remarks not responsive to the officer's questions.[3] (Doc. No. 46, pp. 6-7) The court finds to the contrary. The officer's questions about drugs were intended to elicit incriminating statements from Juan. Because Juan answered these questions before he was advised of his *Miranda* rights, these statements should be suppressed.

### C. Search of the Blue Pickup Truck

After placing Juan under arrest, the officers searched his blue pickup truck incident to the arrest. In *New York v. Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), the Supreme Court held:

> [W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.
>
> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. [Citations omitted.] Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no

---

[3]The Government asserts the officer asked Juan only whether there were any drugs on his person. The court finds the officer's testimony, taken as a whole, does not support this assertion. The court finds the officer's questions about drugs were directed at whether Juan possessed any drugs, which including possession of drugs in his pickup truck.

> privacy interest in the container, but that the lawful custodial
> arrest justifies the infringement of any privacy interest the
> arrestee may have.

*Belton*, 453 U.S. at 460, 101 S. Ct. at 2864; *see also United States v. Searcy*, 181 F.3d 975, 979 (8th Cir. 1999); *United States v. Williams*, 165 F.3d 1193, 1195 (8th Cir. 1999); *United States v. Snook*, 88 F.3d 605, 608 (8th Cir. 1996).

The Eighth Circuit Court of Appeals has held that a contemporaneous search incident to a lawful arrest does not have to occur immediately after the arrest. *See Curd v. City of Judsonia, Ark.*, 141 F.3d 839 (8th Cir. 1998) (search of arrestee's purse fifteen minutes after arrest was considered valid as incident to arrest); *see also United States v. Herring*, 35 F. Supp. 1253, 1256 (D. Or. 1999) (search occurring three to five minutes of arrest was valid, even when arrestee was handcuffed and removed from vehicle at time of search); *United States v. McCrady*, 774 F.2d 868, 871-872 (8th Cir. 1985) (warrantless search of passenger compartment of vehicle occurring after car owner was arrested and placed in police car was valid as incident to arrest). Notably, the fact that a person has "just stepped out of his vehicle as the officer arrived and before his arrest does not alter his status as an 'occupant' of the vehicle." *Snook*, 88 F.3d at 608.

In the present case, the officers saw Juan exit his vehicle immediately before his arrest. For purposes of this analysis, Juan was an "occupant" of the vehicle, and officers could search the vehicle incident to his arrest. *See Belton, supra; Snook, supra.*

The court finds the search of the blue pickup incident to Juan's arrest was lawful.


### D.  Juan's Post-Miranda Statements

Juan argues his post-*Miranda* statements were involuntary and should be suppressed. In particular, Juan claims he was misinformed of his rights by Task Force Officer Wingert, and this misinformation improperly influenced him to make

incriminating statements. He argues that as a result, those incriminating statements should be suppressed.

After his arrest, Juan was taken to the police station and questioned. At the start of the questioning, the following exchange occurred between Task Force Officer Tony Wingert, Officer Chad Cleveland, and Juan:

| | |
|---|---|
| Wingert: | My name's Tony Wingert. Okay? You speak English pretty good? |
| Juan: | Not that good. |
| Wingert: | Not that good. A little bit? You understand it? Okay, if you don't understand something, tell me and we'll bring a guy in here that speaks Spanish, okay? |
| Juan: | All right. |
| Wingert: | We work for the Drug Enforcement Administration here in Sioux City, the Drug Task Force. Okay? Right now, you got caught up in the middle of a conspiracy, a drug conspiracy. Do you know what a drug conspiracy is? Do you know what a conspiracy is? |
| Juan: | No. |
| Wingert: | A conspiracy is two or more people talking about helping each other commit a crime, okay? We found the methamphetamine, you told us methamphetamine was in your pickup. Right? |
| Juan: | Um-hmm. |
| Wingert: | Okay. We work in the federal system. Have you ever been in any trouble before? |
| Juan: | No. |
| Wingert: | You ever been arrested for anything? |
| Juan: | Yeah. |
| Wingert: | What have you been arrested for? |

| | |
|---|---|
| Juan: | DUI. |
| Wingert: | Here? |
| Juan: | Uh-huh. |
| Wingert: | Anything else? |
| Juan: | I got a possession. |
| Wingert: | Of? |
| Juan: | Methamphetamine. |
| Wingert: | Here? |
| Juan: | Yeah. |
| Wingert: | How long ago? |
| Juan: | Like two years. |
| Wingert: | Okay. All right. You know how in State you were able to bond out? And you went to court and everything? |
| Juan: | Uh-huh. |
| Wingert: | Do you remember that, when you were in trouble with your DUI's and stuff? |
| Juan: | Yeah. |
| Wingert: | Okay. The federal system's not that way, okay? The federal system, you get caught with something, you stay in jail. There's no parole. There's no bail. There's no bond. You're in jail and you serve your whole time. Say you're sentenced to five years, you stay in jail for five years. There's no getting out early. All right? With a half pound, five years. The only way that you can stay, you can get your sentence lowered is by talking to us. Okay? You're right here (indicating), right now. Nobody can make you go down here (indicating). You have to stay right here (indicating). The only person that can help you right now is you. If you talk to us, you go lower (indicating). You don't spend as |

long in jail. It's called cooperation. Okay? It's up to the judge how much time you get then. If you stay quiet and don't say anything, you stay right here (indicating). The judge can't – the judge may want to, the judge may think you're a nice guy, but you stay here (indicating). The judge can't bring you down to here (indicating). The only way you can come down is if we say, "Yes, Your Honor, he talked to us. He cooperated." You understand what I'm saying? You comprehending everything?

Juan:          Yeah.

Wingert:       Okay, I'm going to ask you just a few simple questions. How do you spell your last name?

Juan:          A-g-u-i-l-a-r.

Wingert:       First name Juan?

Juan:          Yeah.

Wingert:       Do you have any other names you go by, Juan?

Juan:          Gabriel.

Wingert:       Is that a middle name?

Juan:          Yeah.

Wingert:       Gabriel?

Juan:          Yeah.

Wingert:       What's your address, Juan?

Juan:          [Address given.]

*   *   *

Wingert:       You got a telephone number?

Juan:          Just my cell phone.

Wingert:       What's that?

Juan:          [Phone number given.]

Wingert:      What's your birthday, Juan?

Juan:         January 27, '78.

*  *  *

Wingert:      . . . Your Social Security number?

Juan:         [Social Security number given.]

Wingert:      How tall are you?

Juan:         Uh, I don't know.

Wingert:      How much you weigh?

Juan:         A hundred and forty.

Wingert:      140?  Where you work at, Juan?

Juan:         Uh, Advertising at Mundo Latino.  It's a newspaper, a
              Spanish newspaper.

Wingert:      Over in South Sioux?

Juan:         Yeah.

Wingert:      What do you do for them?

Juan:         I advertise.

Wingert:      Advertising?

Juan:         Yeah.

Wingert:      Okay.  You go out and ask people to put advertisements in
              there?

Juan:         Yeah.

Wingert:      How long you worked there?

Juan:         Six months.

Wingert:      Where'd you work before that?

Juan:         Uh, before that, I worked at TurPak.

| | |
|---|---|
| Wingert: | TurPak? |
| Juan: | Uh-huh. |
| Wingert: | Okay. How long have you lived in the United States? |
| Juan: | Seven years. |
| Wingert: | Seven years? Where were you born? |
| Juan: | In Texas. |
| Wingert: | You were born in Texas? |
| Juan: | Yeah. |
| Wingert: | Oh, so you're a citizen? |
| Juan: | Yes. |
| Wingert: | Where at in Texas? |
| Juan: | Denver City. |
| Wingert: | Denver City? |
| Juan: | Yeah. It's a little town. |
| Cleveland: | You've lived in Sioux City for seven years? |
| Juan: | Uh-huh. No, I've been in the United States for seven years. |
| Wingert: | Did you go down to Mexico for awhile or something? |
| Juan: | Well, I was born in Texas, but we moved to Mexico when I was little. |
| Wingert: | Okay. So, you are a citizen. You were born here. What city in Mexico? |
| Juan: | Chihuahua. |
| Wingert: | Chihuahua. You have any, uh, family that lives here? Is that a girlfriend or a wife? |
| Juan: | It's my girlfriend. |
| Wingert: | You got a wife? |

17

| | |
|---|---|
| Juan: | No. |
| Wingert: | Where's your mom and dad?  They alive? |
| Juan: | Huh? |
| Wingert: | Mom and Dad alive? |
| Juan: | Yeah. |
| Wingert: | Where do they live? |
| Juan: | They live here in Sioux City. |
| Wingert: | They live here in Sioux City? |
| Juan: | Uh-huh. |
| Wingert: | Okay.  What's their name?  What's your dad's name? |
| Juan: | Jose. |
| Wingert: | Jose . . . |
| Juan: | Aguilar. |
| Wingert: | What is your mom's name? |
| Juan: | Carmen. |
| Wingert: | Carmen?  Where do they work at? |
| Juan: | TurPak and Clover Leaf. |
| Wingert: | Which one works at TurPak? |
| Juan: | My dad works at Clover Leaf, my mom at TurPak. |
| Wingert: | Okay. |
| Cleveland: | How old do you think your dad is? |
| Juan: | Um, 48-- no, 58. |
| Cleveland: | 58?  How about your mom? |
| Juan: | 48, 49. |
| Cleveland: | Okay. |

| | |
|---|---|
| Wingert: | Okay. I want to read something to you, all right? This is before you ask [sic] any questions, you must understand. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questionings if you wish. Do you understand these rights? |
| Juan: | Um-hmm. |
| Wingert: | Okay. Like I said, you've been caught with a half pound of methamphetamine. And this is not a State charge, this is not a local charge. This is a United States Government charge, it's a federal charge. Okay? You're right in the middle of a drug conspiracy. We didn't just happen upon you tonight by accident. Okay? We know a lot about you. If you don't wish to answer something, don't lie about it 'cause that'll hurt you. Just say, "I don't want to talk about that right now." But if you answer something and we know that you're lying and we prove that you're lying, then you can't get any cooperation because then we don't know when you were telling the truth and when you were lying. Okay? Some attorney's gonna say, "Well, he lied here but he told the truth here, we think. Which is the truth?" Do you understand that? |
| Juan: | (Nods head up and down.) |
| Wingert: | Okay. The half pound of methamphetamine, where was it going? |
| Juan: | Over there. |
| Wingert: | Over where? |
| Juan: | Where I was stopped. |
| Wingert: | Who lives there? |
| Juan: | Eric. |

| | |
|---|---|
| Wingert: | How long have you known Eric? |
| Juan: | Maybe three months, or more, I don't know. |

(Court's transcription from Gov't Ex. 3.)   Officers continued to question Juan about drug activities.

Juan argues Officer Wingert coerced him into waiving his *Miranda* rights and making incriminating statements by providing him with inaccurate information about what he was facing from the federal criminal justice system.   (Doc. No. 45, pp. 3-9)   He argues Officer Wingert's statements "were flatly untrue, as they were totally inconsistent with the cooperation and sentencing processes in federal court."   (*Id.*, p. 3)   Juan argues his confession was involuntary because he relied on the express or implied promises contained within the officer's misleading statements, which he claims were made improperly for the purpose of coercing him to confess.   (*Id.*, p. 4)   Juan further argues the Government  failed to meet its burden to show he understood and voluntarily waived his *Miranda* rights before speaking with the officers.   He further claims the timing and manner of the officers' representations effectively denied him the ability to make "a real choice regarding the decision to continue speaking with police."   (*Id.*)

Despite the inherently coercive nature of custodial interrogations,  *see Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331, a suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently."   *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628.   However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne."   *United States v. Holloway*, 128 F.3d 1254 (8th Cir. 1997) (citing *United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir. 1995)); *see United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir. 1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct) (citing *Oregon*

*v. Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 1297, 84 L. Ed. 2d 222 (1985)). *See also United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996); *United States v. Anderson*, 929 F. 2d 96, 99 (2d Cir. 1991).[4]

Furthermore, "[t]here is a strong presumption against waiver," and the Government has the burden to show a suspect "'knowingly and intelligently waived his privileges against self-incrimination and his right to retained or appointed counsel.'" *Soffar v. Johnson*, 237 F.3d 411, 454 (5th Cir. 2000) (quoting *Miranda*, 384 U.S. at 475, 86 S. Ct. at 1628). "Indeed, courts must "'indulge every reasonable presumption against waiver of fundamental constitutional rights.'" *Id.* (citations omitted).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir. 1999), the Eighth Circuit Court of Appeals explained how to determine whether a waiver of *Miranda* rights is valid:

> "The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case." *Stumes v. Solem*, 752 F.2d 317,

---

[4]       A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. *See Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S. Ct. 917, 920, 9 L. Ed. 2d 922 (1963). Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973); *Green v. Scully,* 850 F.2d 894, 901-02 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S. Ct. 374, 102 L. Ed. 2d 363 (1988); *see also Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938) (to determine whether defendant made "an intentional relinquishment or abandonment of a known right or privilege" courts must examine "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused"). The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice. *See Colorado v. Connelly,* 479 U.S. 157, 168- 69, 107 S. Ct. 515, 522-23, 93 L. Ed. 2d 473 (1986).

> 320 (8th Cir. 1985). The circumstances include "the background, experience, and conduct of the accused." *Id.* The government has the burden of proving that the defendant "voluntarily and knowingly" waived his rights. *Id.*

*Id.*, 180 F.3d at 977; *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

An inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141 (citing *Edwards v. Arizona,* 451 U.S. at 482, 101 S. Ct. at 1883; *Brewer v. Williams,* 430 U.S. 387, 404, 97 S. Ct. 1232, 1242, 51 L. Ed. 2d 424 (1977)). As the Court explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979). *See also North Carolina v. Butler,* 441 U.S. 369, 374-375, 99 S. Ct. 1755, 1758, 60 L. Ed. 2d 286 (1979).

*Moran,* 475 U.S. at 421, 106 S. Ct. at 1141; *see United States v. Jones*, 23 F.3d 1307 (8th Cir. 1994); *Caldwell*, 954 F.2d at 504. As the Court also held in *Moran*:

> Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421, 106 S. Ct. at 1141 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2571, 61 L. Ed. 2d 197 (1979)).

These principles were summarized by the Eighth Circuit Court of Appeals in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), as follows:

> Inquiry into the validity of a waiver has two distinct dimensions -- whether the waiver is voluntary and whether it is knowing and intelligent. *See United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998). A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. *See id.* A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See id.* The burden of proving that a defendant has knowingly and voluntarily waived his right to have counsel present at an interrogation rests with the government. *See United States v. Eagle Elk*, 711 F.2d 80, 82 (8th Cir. 1983).

*Id.*, 212 F.3d at 420.

With respect to allegations of police coercion in eliciting statements from a suspect, in *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980), the Supreme Court held "coercion is determined from the perspective of the suspect." *See Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 2397, 110 L. Ed. 2d 243 (1990); *see also United States v. Huerth*, 239 F. 3d 865, 871 (7th Cir 2001) (coercion should be analyzed "from the perspective of a reasonable person in the position of the suspect"); *cf. Roberson*, *supra*, 486 U.S. at 687, 108 S. Ct. at 2101. Factors that should be considered in evaluating police coercion are the conduct of the law enforcement officials and the capacity of the suspect to resist the pressure to confess. *United States v. Johnson*, 47 F.3d 272, 276 (8th Cir. 1995). Other relevant factors are "the defendant's age, education, intelligence level, and mental State; the length of the

defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerth*, 239 F. 3d at 871.

In *United States v. Turner*, 157 F.3d 552 (8th Cir. 1998), the Eighth Circuit noted that finding a *Miranda* waiver to be invalid requires more than coercive police activity:

> It is true, as the government notes, that in [*Colorado v.*] *Connelly*, 479 U.S. [157,] 167, 107 S. Ct. 515, [522, 93 L. Ed. 2d 473 (1986)], the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" However, later that term, in *Colorado v. Spring*, 479 U.S. 564, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987), the Supreme Court made clear that validity of a *Miranda* waiver has "'two distinct dimensions'" -- whether the waiver is voluntary and whether it is knowing and intelligent. *Id.* at 573, 107 S. Ct. 851 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

*Turner*, 157 F.3d at 555. Relying on *Connelly*, the court in *Turner* held police coercion is a necessary prerequisite to a determination that a waiver was involuntary, but not to the separate question of whether the waiver was knowing and intelligent. *Id.* The requisite "coercion" may take the form of the accused being "'threatened, tricked, or cajoled into a waiver [which] will, of course, show that the defendant did not voluntarily waive his privilege [against self-incrimination.'" *Soffar*, *supra*, 237 F.3d at 454 (quoting *Miranda*, 384 U.S. at 476, 86 S. Ct. at 1629).

The court must apply these principles to the facts of the present case to determine whether Juan knowingly, intelligently, and voluntarily waived his *Miranda* rights. Throughout this analysis, the court will keep in mind the "twin rationales [for suppressing evidence] – trustworthiness and deterrence," to see whether suppression of Juan's post-*Miranda* statements would serve the general goal of deterring unlawful police conduct and

24

the Fifth Amendment goal of assuring the receipt of trustworthy evidence. *See Anderson*, 929 F. 2d at 102 (citing *Elstad,* 470 U.S. at 308, 105 S. Ct. at 1292).

The question to be decided in the present case is whether, under the peculiar facts of this case, the Government has sustained its burden of proving that Juan gave up his right to remain silent "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628. This determination must be made from the perspective of a reasonable person in Juan's position, and not from the perspective of the police. *See Rhode Island v. Innis*, *supra*, 446 U.S. at 301, 100 S. Ct. at 1689; *Huerth*, 239 F.3d at 871; *see also Moran*, 475 U.S. at 423, 106 S. Ct. at 1142 (state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights);[5] *Arizona v. Roberson*, *supra*, 486 U.S. at 687, 108 S. Ct. at 2101 (citing *Edwards*). The two dimensions of waiver are (1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent. *Holman*, 212 F.3d at 420.

A waiver is "voluntary" if it is the product of "a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* The facts here contain no evidence of intimidation or coercion; the question is whether Juan's statements were the product of deception resulting from Officer Wingert's statements about what he was facing in the federal system. Juan argues those statements were false or misleading. The court first will look to see whether Officer Wingert's statements were false. Officer Wingert told Juan the following:

---

[5]In *Moran*, the Supreme Court held that "whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Id.* 475 U.S. at 423, 106 S. Ct. at 1142.

1)      In the federal system, when someone gets caught with drugs, the person will "stay in jail.  There's no parole.  There's no bail.  There's no bond.  You're in jail and you serve your whole time.  Say you're sentenced to five years, you stay in jail for five years.  There's no getting out early."

2)      The only way Juan could receive a lower sentence was to cooperate with the officers, and if he talked to them, he would not "spend as long in jail."

3)      It would be up to the judge to decide the length of Juan's sentence, but even the judge could not reduce the length of the sentence unless the officers told the judge Juan had cooperated with them.

Juan argues these statements are "factually inaccurate" and "misrepresentations of the law," because "the decision as to whether the defendant receives a reduction in his sentence is within neither the decision making process of the agents or the judge . . . but rather the recommendation for a reduction in a defendant's sentence is strictly within the purview of the United States Attorney's Office."  (Doc. No. 45, p. 5)  He further notes Officer Wingert did not mention that to receive a motion for sentence reduction, Juan would have to provide "substantial assistance" to the Government.  Instead, the officer told Juan he "merely needed to speak to the agents in order to receive credit for his cooperation and thus a reduced sentence."  (*Id.*)

The court finds no constitutional violation in Officer Wingert's statements, as far as they went.  The officers act in concert with the Government in interviewing defendants and obtaining their cooperation.  To that extent, the officers have input into the Government's decision whether or not to file a substantial assistance motion.  Therefore, it was not inaccurate to represent to Juan that the officers' statements regarding his cooperation, or lack thereof, potentially could affect the length of his sentence.

Furthermore, even if the officer's statements were not completely accurate, officers may mislead a suspect without invalidating a confession as long as the deception does not relate to the nature of the suspect's *Miranda* rights. *See, e.g., Illinois v. Perkins,* 496 U.S. at 297, 110 S. Ct. at 2397 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns"); *Oregon v. Mathiason,* 429 U.S. 492, 495-496, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) *(per curiam)* (officer's falsely telling suspect that suspect's fingerprints had been found at crime scene did not render interview "custodial" under *Miranda*); *Frazier v. Cupp,* 394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (lie that cousin had confessed did not invalidate defendant's confession); *Hoffa v. United States,* 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (placing an undercover agent near a suspect in order to gather incriminating information was permissible under the Fifth Amendment); *United States v. Valasquez,* 885 F. 2d 1076, 1087 (3d Cir. 1989) (lie that defendant's companion had implicated defendant and was being released did not invalidate confession). However, no case has ever held that it is permissible for the police to deceive or mislead a suspect about his *Miranda* rights.[6]

Thus, under the *Turner* test, the court finds that because Juan's waiver of his right to remain silent was not the product of intimidation, coercion, or impermissible deception regarding his rights, his post-*Miranda* statements to the officers were voluntary. *See*

---

[6] In fact, police deception about a suspect's *Miranda* rights can invalidate a confession even thought the deception occurred *after* the suspect was properly advised of his rights and waived them. In *United States v. Anderson,* 929 F. 2d 96 (2d Cir. 1991), a government agent gave the *Miranda* warnings to the defendant, and the defendant agreed to give a statement. Then the agent went further, and told the defendant that "if he asked for a lawyer it would permanently preclude him from cooperating with the police." *Id.,* 929 F.2d at 98. The court suppressed the ensuing confession, holding that under the totality of the circumstances, the agent's false statement about the consequences of asking for a lawyer "contributed to the already coercive atmosphere inherent in custodial interrogation and rendered [the defendant's] confession involuntary as a matter of law." *Id.,* at 102.

*Turner*, 157 F.3d at 555.  In addition, the court does not find Officer Wingert made "promises" to Juan that induced him to waive his rights.  The court now must determine whether Juan's waiver of his rights was "knowing and intelligent."

A waiver is "knowing and intelligent" if "it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Holman*, 212 F.3d at 420.  The record indicates Juan was aware of and understood his rights.  However, the record is less than clear regarding whether Juan had "a full awareness of . . . the consequences of the decision to abandon [his rights]."  *Id.*  Further, the Government has made no showing whatsoever that Juan affirmatively stated he was willing to waive his rights.  Officer Wingert never asked Juan if he was willing to waive his rights.  Rather, the officer read Juan a statement of his rights, asked Juan if he understood his rights, and after receiving a grunted "um-hmm" in response, immediately began questioning him about drug activities.  At the hearing on Juan's motion, Officer Wingert was asked if he was satisfied that Juan understood the significance of his *Miranda* rights that had been read to him in English.  Officer Wingert replied, "I asked if he understood and he said he did."  Tr. at 35.

The United States Supreme Court has noted that even an express written or oral statement of waiver of the right to remain silent -- neither of which we have in this case -- is not "necessary or sufficient to establish waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286 (1979).  The *Butler* Court further held:

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.  As was unequivocally said in *Miranda*, mere silence is not enough.  That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may

> never support a conclusion that a defendant has waived his
> rights. The courts must presume that a defendant did not
> waive his rights; the prosecution's burden is great; but in at
> least some cases waiver can be clearly inferred from the
> actions and words of the person interrogated. [Footnote
> omitted.]

*Id.* The Court noted that, consistent with its opinion in *Butler*, a district court "*may* find an intelligent and understanding rejection [of the defendant's rights] where the defendant did not *expressly* state as much." *Id.* n.4 (emphasis by the Court).

To determine whether this is a case where the court should find Juan knowingly and intelligently understood and waived his rights, without expressly so stating, the court must consider all of the surrounding circumstances. No expressed declaration is necessary to effect waiver. *United States v. Marchildon*, 519 F.2d 337, 343 (8th Cir. 1975). In this case, the court finds the following facts relating to the waiver issue:

1)    Juan was given full and complete *Miranda* warnings twice – once at the time of his arrest, and once during his questioning by Officers Wingert and Cleveland.

2)    Juan indicated he understood his rights on both occasions.

3)    Juan conversed with officers in English, both at the scene of his arrest and in subsequent questioning.

4)    None of the officers ever tried to deny or evade Juan's constitutional rights.

5)    Juan's statements were not the product of intimidation, threats, coercion, prodding, or promises.

6)    At the time of his arrest, Juan had been living in the United States for seven years. He had prior encounters with law enforcement, and thus had some familiarity with the nature of his constitutional rights.

7)    Juan is twenty-six years old and has a high school education.

8)    There is nothing in the interview (*see* Gov't Ex. 3) that indicates Juan was under the influence of alcohol or other drugs at the time of the interview.

Under these circumstances, the court finds Juan's actions in responding to questions after he was advised, twice, of his rights constituted a knowing and intelligent waiver of those rights, despite the officers' failure to ask him specifically if he was willing to waive his rights, and despite Juan's failure to make an express statement that he was willing to waive his rights. As a result, his post-*Miranda* statements should not be suppressed.

### E.  Search of Juan's Room

Task Force officers searched Juan's room in the Aguilar house without a warrant but with his consent. Juan appears to be arguing that his consent was not given voluntarily.[7]  For the reasons discussed above in connection with the voluntariness of Juan's post-*Miranda* statements, together with the reasoning set out below, the court finds Juan's consent to the search of his room was valid.

A warrantless search is lawful if it follows a proper consent to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct 2041, 2043-44 (1973). There is no question on this record that Juan consented to the search of his room at the Aguilar house, or that officers searched the room pursuant to this consent and found incriminating evidence within the room. The question here is whether Juan's consent was given voluntarily and without coercion. The Government has the burden of establishing an

---

[7]Again, it is not entirely clear from anything filed by Juan in this case that he is challenging his consent to the search of his room. *See* note 2, *supra*. Nevertheless, to provide a complete record for the district court, the court will address the validity of the consent.

exception to the Fourth Amendment's warrant requirement by a preponderance of the evidence. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

"A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir.2005). The Government has the burden of proving voluntary consent by a preponderance of the evidence. *Id.* In determining whether a consent to a search was voluntary, the following factors are relevant: "(1) the individual's age; (2) [his] general intelligence and education; (3) whether [he] was under the influence of drugs or alcohol; (4) whether [he] was informed of [his] *Miranda* rights prior to any consent; and (5) whether [he] had experienced prior arrests and was thus aware of the protections the legal system affords suspects." *Id.*

The court has made factual findings regarding each of these factors, above, and all of those findings leading to the conclusion that the Government has established by a preponderance of the evidence that Juan's consent to the search of his room was voluntary and not coerced.

Jose also challenges the search of Juan's room, but his challenge is to no avail because Jose had no expectation of privacy in Juan's room that would allow him to raise the issue. *See, e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373 (1998) ("We have held that 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); and citing *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S. Ct. 2556, 62 L. Ed. 2d 633 (1980)).

### F. Search of the Ford Ranger

Jose challenges the warrantless search of his Ford Ranger. He argues the "automobile exception" to the warrant requirement does not apply to a vehicle parked on private property, citing *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct 2066, 2072 (1985). (*See* Doc. No. 29, p. 4; Doc. No. 44, pp. 7-8) In *Carney*, the Supreme Court held the automobile exception is applicable only "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes – temporary or otherwise. . . ." The Government disagrees with Juan's position, also citing *Carney*, 471 U.S. at 391, 105 S. Ct. at 2069 ("Even in cases where an automobile is not immediately mobile, the lesser expectation of privacy resulting from its use as a ready mobile vehicle justified application of the vehicular exception."). The Government also cites *United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000), and *United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987). (*See* Doc. No. 34, p. 7; Doc. No. 46, pp. 7-8) Jose also argues there was no probable cause to search the vehicle. (Doc. No. 29, p. 3; Doc. No. 44, p. 7) The Government disagrees. (Doc. No. 34, pp. 7-8)

The court will not address whether it was lawful for Officer Simons to enter onto the property where the Ford Ranger was parked. The court finds Jose has failed to meet his burden to show he had an expectation of privacy with respect to the property. In any event, the Ford Ranger was parked outside curtilage of the Aguilar's property, so the officer was not prohibited by the Fourth Amendment from entering onto the parking area to look at the Ford Ranger. *See United States v. Friend*, 50 F.3d 548, 552 (8th Cir. 1995) (Fourth Amendment does not protect limited investigation of vehicle parked outside curtilage of house), *vacated and remanded on other grounds*, 517 U.S. 1152, 116 S. Ct. 1538 (*mem.*), 134 L. Ed. 2d 643 (1996); *United States v. Mooring*, 137 F.3d 595, 596

(8th Cir. 1998) ("The Fourth Amendment protects people from unreasonable searches of their home and buildings within the home's curtilage, but police officers may enter a resident's property to observe buildings located outside home's curtilage.").

The first question here is whether Officer Simons had probable cause to conduct a limited search of the Ford Ranger. The court finds there was ample probable cause to search the vehicle. Probable cause for a search exists "when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317(1983). Here, the search of the Ford Ranger was commenced when Officer Simons first opened the driver's side door of the Ford Ranger and looked under the seat, where he saw a package of what looked like, and eventually was determined to be, methamphetamine.[8] By the time Officer Simons opened the door to the Ford Ranger, Task Force officers had developed the following information. A drug dealer named McCoy was getting his drugs from Juan Aguilar and his brother, who both lived at the Aguilar house. Juan had been arrested, and methamphetamine had been found in his blue pickup truck. Juan had admitted there were drugs in his room at the Aguilar house. Juan and Jose had used a white truck in their drug dealings. After Juan's arrest, a woman, in short sleeves on a cold day, took a sack from the Aguilar house to a white Ford Ranger parked behind house and then quickly returned to the house without the sack. The Ford Ranger was registered jointly to Juan's brother

---

[8]If it was unlawful for Officer Simons to search the vehicle at that time, the subsequent search of the vehicle after the drug dog arrived and alerted on the door of the Ford Ranger would have been tainted by the earlier, unlawful search under the "fruit of the poisonous tree" doctrine. *See Costello v. United States*, 365 U.S. 265, 280, 81 S. Ct. 534, 542 5 L. Ed. 2d 551 (1961) ("[T]he 'fruit of the poisonous tree' doctrine excludes evidence obtained from or as a consequence of lawless official acts[.]"); *Peterson v. United States*, 411 F.2d 1074, 1078 (8th Cir. 1969) ("It is axiomatic that evidence, tangible or intangible, directly or indirectly gained as a result of an illegal search is tainted fruit of the poisonous tree and is inadmissible.") (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

Jose, and Jose's wife. Officer Simons had looked into the vehicle and had observed, in plain view, a sack matching the one he had seen the woman carry out to the vehicle. The sack now was empty. Under the totality of these circumstances, a reasonable law enforcement officer could have concluded there was a fair probability that there were illegal drugs in the vehicle. Thus, there was probable cause to search the vehicle. *See Florida v. White*, 526 U.S. 559, 563-64, 119 S. Ct. 1555, 1558, 143 L. Ed. 2d 748 (1999) ("When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.")

The question that remains is whether the automobile exception to the Fourth Amendment warrant requirement applies to a vehicle parked on private property. *See Carney, supra*. The Supreme Court answered this question in *Pennsylvania v. Labron*, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996), where the Court overruled two lower court rulings that the automobile exception required both the existence of probable cause and the presence of exigent circumstances to justify a warrantless search. The Supreme Court held the automobile exception no longer depended on exigency, as was the case when the doctrine first was established. Rather, the automobile exception now would be justified on two distinct grounds: (1) the ready mobility of automobiles, and (2) the reduced expectation of privacy in automobiles. *Labron*, 518 U.S. at 940, 116 S. Ct. at 2487. Also, although a reduced expectation of privacy is part of the justification for the automobile exception, it does not appear that a specific expectation of privacy in a particular case would render the automobile exception inapplicable. The *Labron* Court held, "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle *without more.*" *Id.* (*emphasis added*). *See Fladten*, 230 F.3d at 1086 n.4; *cf. United*

34

*States v. Mercado*, 307 F.3d 1226, 1229 (10th Cir. 2002) (court not persuaded by claim of heightened expectation of privacy in van left in repair shop).

In any event, the court finds Jose did not have a greater expectation of privacy in the Ford Ranger where it was parked, which was just off a public alley, then he would have had if the truck were being driven or had been parked on a public street. Even if the parking area where the Ford Ranger was parked was private property, Jose reasonably should have expected that anyone walking down the alley might look into the truck and see the sack on the driver's seat.

Here, the vehicle was readily mobile,[9] and probable cause existed to believe the vehicle contained contraband. Under *Labron*, nothing more is required for the search to have been lawful.

### G.  Search Warrant for the Aguilar House

Both Juan and Jose challenge the search warrant for the Aguilar house, where they lived with their parents and Jose's wife. Addressing Juan's claim first, in order to contest the search, Juan "had the burden of establishing, under the totality of the circumstances, the search or seizure violated his legitimate expectation of privacy in [the Aguilar house]." *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S. Ct. 2556, 2561, 62 L. Ed. 2d 633 (1980)). *See Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373 (1998)

---

[9]At least the record does not reflect otherwise. *See United States ve. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987) (lawfulness of search approved where the vehicle's alleged immobility was not visibly apparent). In addition, it is not clear that even temporary immobility (for example, from mechanical problems) would invalid the search. *See United States v. Mercado*, 307 F.3d 1226, 1229 (10th Cir. 2002) (vehicle with mechanical problems had not lost its inherent mobility because it could be repaired); *see also United States v. Maggard*, 221 F.3d 1345 (Table), 2000 WL 680394 (8th Cir. 2000) (truck stuck in a ditch had not lost its inherent mobility because it could be towed).

("We have held that 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); and citing *Rawlings,* 448 U.S. at 106). Juan has not satisfied this burden.

Jose challenges the search warrant on the basis that it was supported by evidence discovered in the search of the Ford Ranger, which Jose argues was illegal. He claims when evidence is removed from the affidavit in support of the search warrant that relates directly to discovery of drugs in the Ford Ranger, then the affidavit does not show probable cause to issue a warrant to search the Aguilar house. (*See* Doc. No. 29-2 at 5-6). Because the court has found the search of the Ford Ranger was lawful, Jose's argument must fail.

The United States Supreme Court has set the standard for review of a search warrant application, as follows:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli [v. United States,]* 309 U.S. [410,] 419, 89 S. Ct. [1509,] 590[, 21 L. Ed. 2d 637 (1969)]. "A grudging or negative attitude by reviewing courts toward warrants," *[United States v.] Ventresca,* 380 U.S. [102,] 108, 85 S. Ct. [741,] 745, [13 L. Ed. 2d 684 (1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant [and] "courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.*, [380 U.S.] at 109, 85 S. Ct. at 746.
>
>      . . . . Reflecting this preference for the warrant process, the traditional standard for review of an issuing

magistrate's probable cause determination has been that so long as the magistrate had a "substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 736, 4 L. Ed. 2d 697 (1960). *See United States v. Harris*, 403 U.S. 573, 577-583, 91 S. Ct. 2075, 2079-2082, 29 L. Ed. 2d 723 (1971). [FN10]

[FN10] We also have said that "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *Ventresca, supra*, 380 U.S. at 109, 85 S. Ct. at 746. This reflects both a desire to encourage use of the warrant process by police officers and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.

*Illinois v. Gates*, 462 U.S. 213, 236-37 & n.10, 103 S. Ct. 2317, 2331 & n.10, 76 L. Ed. 2d 527 (1983).

Thus, the scope of this court's review of the search warrant in this case is limited to a determination of whether the magistrate had a "substantial basis" to conclude a search would uncover evidence of wrongdoing. In conducting this review, the court is mindful that

affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law have no proper place in this area." *Ventresca, supra*, 380 U.S. at 108, 85 S. Ct. at 745. . . . [M]any warrants are – quite properly . . . issued on the basis of nontechnical, common-

sense judgment of laymen applying a standard less demanding
than those used in more formal legal proceedings.

*Gates*, 462 U.S. at 235-36, 103 S. Ct. at 2331. As the Supreme Court further explained:

> The task of the issuing magistrate is simply to make a
> practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including
> the "veracity" and "basis of knowledge" of persons supplying
> hearsay information, there is a fair probability that contraband
> or evidence of a crime will be found in a particular place.
> And the duty of a reviewing court is simply to ensure that the
> magistrate had a "substantial basis for . . . conclud[ing]" that
> probable cause existed. *Jones v. United States,* 362 U.S.
> [257,] 271, 80 S. Ct. [725,] 736[, 4 L. Ed. 2d 697 (1960)].
> We are convinced that this flexible, easily applied standard
> will better achieve the accommodation of public and private
> interests that the Fourth Amendment requires than does [the
> prior legal standard].

*Gates*, 462 U.S. at 238-39, 103 S. Ct. at 2332. *See also United States v. Fulgham*, 143
F.3d 399, 400-01 (8th Cir. 1998) ("When we review the sufficiency of an affidavit
supporting a search warrant, great deference is accorded the issuing judicial officer. *See
United States v. Day*, 949 F.2d 973, 977 (8th Cir. 1991).")

In the present case, the affidavit in support of the search warrant application
contained ample probable cause, even without the evidence found in the Ford Ranger.
In the application, Task Force Officer Wagner related the facts surrounding Juan's arrest,
the discovery of methamphetamine in Juan's truck, Juan's consent to a search of his
bedroom inside the Aguilar house, officers' discovery of "two plastic baggies containing
a white powdery substance" in Juan's bedroom, and the fact that officers had seen a
woman hurriedly carrying a plastic bag out to the area where the Ford Ranger was parked
shortly after Juan's arrest.

Considering the totality of the circumstances, the facts contained in the search warrant application were sufficient for the magistrate to find probable cause to issue the warrant. Giving due deference to the magistrate's determination of probable cause, "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing[.]" *Gates*, 462 U.S. at 236-37, 103 S. Ct. at 2331.

## IV. CONCLUSION

For the above reasons, **IT IS RESPECTFULLY RECOMMENDED** that the defendants' motions to suppress be **denied in part and granted in part**, consistent with this report and recommendation.

Any party who objects to this report and recommendation must serve and file specific, written objections by **June 16, 2005**. Any response to the objections must be served and filed by **June 20, 2005.**

**IT IS SO ORDERED.**

**DATED** this 8th day of June, 2005

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT