**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES ,

        Plaintiff,

vs.

JOSE AGUILAR-BARRAZA and JUAN
AGUILAR-BARRAZA, a/k/a Juan
Gabriel Aguilar,

        Defendants.

No. CR05-4040-MWB

**ORDER REGARDING
MAGISTRATE'S REPORT AND
RECOMMENDATION
CONCERNING DEFENDANTS'
MOTIONS TO SUPPRESS**

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A.  Procedural Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  LEGAL ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   A.  Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   B.  Objections To Report and Recommendation  . . . . . . . . . . . . . . . . . . 17
      1.  Probable cause to search the white Ford Ranger . . . . . . . . . 17
      2.  Need for search warrant to search the white Ford Ranger . . . 20
      3.  Canine sniff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      4.  Search of residence . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On March 16, 2005, an indictment was returned against defendants Jose Aguilar-Barraza and Juan Aguilar-Barraza, charging each with conspiracy to distribute 500 grams or more of methamphetamine and to distribute 500 grams or more of powder cocaine, in violation of 21 U.S.C. § 846, possessing 500 grams or more of powder cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and charging defendant Juan Aguilar-Barraza with distributing 50 grams or more of methamphetamine, in violation 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Each defendant filed a motion to suppress. In his motion, Juan moves to suppress his statements made to law enforcement after he was taken into custody, but before he was advised of his *Miranda* rights, and all evidence flowing from those statements, including the evidence found in his pick-up truck as well as in a pick-up truck located behind his residence. Jose moves to suppress the evidence found in a pickup truck behind his residence and in the basement of his residence. Defendants' motions to suppress were referred to United States Magistrate Judge Paul A. Loss, pursuant to 28 U.S.C. § 636(b). Judge Loss conducted an evidentiary hearing and then filed a Report and Recommendation in which he recommends that defendants' motions to suppress be granted in part and denied in part. Judge Loss concluded that a prudent officer reasonably could believe that Juan had arrived at an apartment to deliver methamphetamine. Accordingly, there was probable cause for the Task Force officers conducting surveillance at the apartment to believe that Juan was engaging in criminal activity and the officers had the right to arrest him without a warrant, and to search his person incident to the arrest. Judge Loss also concluded, concerning Juan's pre-*Miranda* statements to the police, that police officer's questions about weapons, knives, and needles were entirely proper but the police officer's questions about drugs were intended to elicit

incriminating statements from Juan and because Juan answered these questions before he was advised of his *Miranda* rights, these statements should be suppressed. Next, Judge Loss found that the search of a blue pickup truck was incident to Juan's arrest and therefore lawful. Judge Loss further concluded that Juan's waiver of his right to remain silent was voluntary, knowing and intelligent. Thus, Juan's statements to law enforcement personnel were voluntary. In addition, Judge Loss found that Juan's consent to a search of his bedroom was voluntarily, knowingly and intelligently made. Judge Loss further found that Jose did not have standing to object to the search of Juan's bedroom. Judge Loss next addressed the search of Jose's Ford Ranger pickup truck, and concluded that the automobile exception to the Fourth Amendment search warrant requirement applied to the search of Jose's Ford Ranger. Finally, Judge Loss addressed the defendants' challenges to the search warrant for their parents' home. Judge Loss found that Juan did not satisfy his burden of establishing a legitimate expectation of privacy in his parents' home. Judge Loss further found that, under the totality of the circumstances, the facts contained in the search warrant application were sufficient to find probable cause to issue the search warrant for the house.

Jose has filed objections to Judge Loss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Loss's recommended disposition of defendants' motions to suppress.

## B. Factual Background

In his Report and Recommendation, Judge Loss made the following findings of fact:

> On March 1, 2005, officers of the Tri-State Drug Task Force in Sioux City, Iowa, arrested Leroy Eric McCoy on drug charges. McCoy agreed to cooperate with law

enforcement. He identified an individual he knew as "Juan" as his source of supply for methamphetamine, and stated Juan's brother was his source of supply for cocaine. McCoy identified the house where Juan and his brother lived as a particular residence in Sioux City, Iowa (the "Aguilar house"). McCoy stated that during drug transactions, Juan and his brother drove a small blue car, a small blue pickup, or a white truck.

Officers set up surveillance at McCoy's apartment and at the Aguilar house. Then, in a recorded conversation, McCoy called Juan and ordered a half pound of methamphetamine. McCoy arranged for Juan to come to McCoy's apartment to make the delivery. Task Force officer Winger drove McCoy to his apartment to identify "Juan." As they arrived, McCoy identified a man getting out of a light blue pickup parked directly across from McCoy's apartment building as Juan. The man approached the door to McCoy's apartment and knocked. When no one answered, the man started walking back toward his vehicle. Task Force officers then approached the man, identified themselves, took him the ground, handcuffed him, and placed him under arrest. The man later was identified as the defendant Juan Aguilar Barraza.

After the arrest, the officers moved Juan away from the apartment building and searched him incident to the arrest. During the search, Task Force Officer Address asked Juan if he had any weapons, guns, knives, needles, or drugs. Juan responded that there were drugs in his truck. Officer Address asked him how much, and Juan responded "a half pound." Juan then was advised of his *Miranda* rights. Task Force officers searched the pickup and found a half pound of methamphetamine.

Other Task Force officers continued surveillance at the Aguilar house. Officer Simons was in a vehicle parked in an alley across the street from the residence when he was advised over the radio that a suspect had been arrested near McCoy's apartment, and the suspect was found to be in possession of

drugs. A short time later, Officer Simons observed an Hispanic female come out of the Aguilar house and walk to a parking area behind and across the alley from the Aguilar house. Despite the cold weather, the woman was not wearing a jacket but only a short-sleeved shirt. The area where the pickup was parked was not part of the Aguilar homestead, but was private property where the AGUILAR apparently had permission to park their vehicles. Officer Simons could see the front of a white Ford Ranger (the "Ford Ranger") that was parked in the parking area, and he previously had determined from the Ford Ranger's license plate that the vehicle was registered to Jose and Emma Aguilar. The Ford Ranger generally matched the description given by McCoy of one of the vehicles used by Juan and his brother to deliver drugs. In her right hand, the woman was carrying a plastic grocery sack containing a square object. Officer Simons lost sight of the woman when she got past the front of the Ford Ranger. Less than a minute later, she returned to the house without the sack.

After his arrest, Juan was taken to the Sioux City Police Department, where he again was advised of his *Miranda* rights. He then was questioned, and made numerous incriminating statements. He stated the Aguilar house was his parents' house; he lived in an upstairs bedroom in the house; and his brother, Jose, lived in the basement. He admitted there were drugs in his bedroom, and consented to a search of the bedroom.

Task Force officers then went to the Aguilar house and received consent from Juan's parents to enter the house to search Juan's room. During the search of Juan's bedroom, the officers found some white powder in a plastic bag. Upon this discovery, the officers stopped their search to seek a search warrant for the entire house.

When the officers first arrived at the Aguilar house to search Juan's room, Officer Simons walked to the parking area behind the house to look for the sack the female had carried out earlier. From his training and experience, Officer Simons suspected that when Juan had not returned from the delivery at

the McCoy apartment, the female had removed drugs from the house to hide them in the Ford Ranger. Officer Simons looked in the window of the Ford Ranger and saw the grocery sack, which was empty, on the driver's seat, but nothing else. He then opened the driver's side door and looked under the seat where he saw, and then touched, a softball-sized round item wrapped in duct tape. From his training and experience, he recognized the package as likely containing illegal drugs. He then shut the door and called for a drug dog. When the drug dog arrived, it alerted on the driver's side door of the Ford Ranger. Officer Simons then opened the driver's side door again and picked up the round package. He also found a square box behind the driver's seat.

Later, Task Force officers obtained a State of Iowa search warrant authorizing the search of the entire residence. In the search warrant application, Task Force Officer Wagner stated the following:

> On 3-01-05 members of the Tri-State Drug Task Force arranged for a Hispanic male, later identified as Juan AGUILAR, to deliver a half pound of methamphetamine to the 600 Blk of 13th St. in Sioux City, Iowa. Juan AGUILAR arrived in the 600 Blk of 13th Street and [was] found in possession of approximately a half pound of methamphetamine. Juan AGUILAR was placed under arrest and taken to the Sioux City Police Department to be interviewed. During the Interview Juan AGUILAR gave Task Force Officers consent to search his bedroom inside of [the Aguilar house] in Sioux City, Iowa. Officers] Wagner & Simons observed a female, later identified as Emma AGUILAR exit the [Aguilar house] carrying a box. Emma AGUILAR walked towards a Ford Ranger. Upon asking EMMA AGUILAR about taking the package to the pickup, she stated that her Brother in law Juan AGUILAR called her husband (Jose AGUILAR) and advised him to take the box to the truck. Upon a K-9 sniff of the vehicle, Officers located approximately

6

one and a half pounds of an off-white substance in the truck. Upon a consent search of Juan AGUILAR's bedroom, officers located two plastic baggier containing a white powdery substance. This warrant is submitted to request permission to search the entire [Aguilar house]. Emma AGUILAR also stated that there is a handgun located in basement of [the Aguilar house] in Sioux City, Iowa.

During their search of the Aguilar house pursuant to the warrant, officers discovered a handgun, a substance used as a cutting agent for cocaine, drug notes, and a small amount of cocaine, all in Jose's room in the basement.

Report and Recommendation at pp. 3-6 (footnote omitted). Judge Loss also made the following findings of fact:

> After his arrest, Juan was taken to the police station and questioned. At the start of the questioning, the following exchange occurred between Task Force Officer Tony Winger, Officer Chad Cleveland, and Juan:

| Winger: | My name's Tony Winger. Okay? You speak English pretty good? |
|---------|------------------------------------------------------------|
| Juan:   | Not that good. |
| Winger: | Not that good. A little bit? You understand it? Okay, if you don't understand something, tell me and we'll bring a guy in here that speaks Spanish, okay? |
| Juan:   | All right. |
| Winger: | We work for the Drug Enforcement Administration here in Sioux City, the Drug Task |

|         |                                                                                                                                                                                                 |
|---------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | Force. Okay? Right now, you got caught up in the middle of a conspiracy, a drug conspiracy. Do you know what a drug conspiracy is? Do you know what a conspiracy is?                               |
| Juan:   | No.                                                                                                                                                                                              |
| Winger: | A conspiracy is two or more people talking about helping each other commit a crime, okay? We found the methamphetamine, you told us methamphetamine was in your pickup. Right?                    |
| Juan:   | Um-hmm.                                                                                                                                                                                          |
| Winger: | Okay. We work in the federal system. Have you ever been in any trouble before?                                                                                                                   |
| Juan:   | No.                                                                                                                                                                                              |
| Winger: | You ever been arrested for anything?                                                                                                                                                             |
| Juan:   | Yeah.                                                                                                                                                                                            |
| Winger: | What have you been arrested for?                                                                                                                                                                 |
| Juan:   | DUOS.                                                                                                                                                                                            |
| Winger: | Here?                                                                                                                                                                                            |
| Juan:   | Uh-huh.                                                                                                                                                                                          |
| Winger: | Anything else?                                                                                                                                                                                   |
| Juan:   | I got a possession.                                                                                                                                                                              |
| Winger: | Of?                                                                                                                                                                                              |
| Juan:   | Methamphetamine.                                                                                                                                                                                 |

| | |
|---|---|
| Winger: | Here? |
| Juan: | Yeah. |
| Winger: | How long ago? |
| Juan: | Like two years. |
| Winger: | Okay. All right. You know how in State you were able to bond out? And you went to court and everything? |
| Juan: | Uh-huh. |
| Winger: | Do you remember that, when you were in trouble with your DUOS's and stuff? |
| Juan: | Yeah. |
| Winger: | Okay. The federal system's not that way, okay? The federal system, you get caught with something, you stay in jail. There's no parole. There's no bail. There's no bond. You're in jail and you serve your whole time. Say you're sentenced to five years, you stay in jail for five years. There's no getting out early. All right? With a half pound, five years. The only way that you can stay, you can get your sentence lowered is by talking to us. Okay? You're right here (indicating), right now. Nobody can make you go down here (indicating). You have to stay right here (indicating). The only |

person that can help you right now is you.  If you talk to us, you go lower (indicating).    You don't spend as long in jail.  It's called cooperation.  Okay?  It's up to the judge how much time you get then.  If you stay quiet and don't say anything, you stay right here (indicating).  The judge can't – the judge may want to, the judge may think you're a nice guy, but you stay here (indicating).  The judge can't bring you down to here (indicating).    The only way you can come down is if we say, "Yes, Your Honor, he talked to us.  He cooperated."    You understand what I'm saying?    You comprehending everything?

Juan:        Yeah.

Winger:      Okay, I'm going to ask you just a few simple questions.  How do you spell your last name?

Juan:        A-g-u-I-l-a-r.

Winger:      First name Juan?

Juan:        Yeah.

Winger:      Do you have any other names you go by, Juan?

Juan:        Gabriel.

Winger:      Is that a middle name?

Juan:        Yeah.

Winger:      Gabriel?

Juan:       Yeah.

Winger:     What's your address, Juan?

Juan:       [Address given.]

*   *   *

Winger:     You got a telephone number?

Juan:       Just my cell phone.

Winger:     What's that?

Juan:       [Phone number given.]

Winger:     What's your birthday, Juan?

Juan:       January 27, '78.

*   *   *

Winger:     . . . Your Social Security number?

Juan:       [Social Security number given.]

Winger:     How tall are you?

Juan:       Uh, I don't know.

Winger:     How much you weigh?

Juan:       A hundred and forty.

Winger:     140?  Where you work at, Juan?

Juan:       Uh, Advertising at Mundo Latino.
            It's a newspaper, a Spanish
            newspaper.

Winger:     Over in South Sioux?

Juan:       Yeah.

Winger:     What do you do for them?

Juan:       I advertise.

| | |
|---|---|
| Winger: | Advertising? |
| Juan: | Yeah. |
| Winger: | Okay. You go out and ask people to put advertisements in there? |
| Juan: | Yeah. |
| Winger: | How long you worked there? |
| Juan: | Six months. |
| Winger: | Where'd you work before that? |
| Juan: | Uh, before that, I worked at TurPak. |
| Wingert: | TurPak? |
| Juan: | Uh-huh. |
| Wingert: | Okay. How long have you lived in the United States? |
| Juan: | Seven years. |
| Wingert: | Seven years? Where were you born? |
| Juan: | In Texas. |
| Wingert: | You were born in Texas? |
| Juan: | Yeah. |
| Wingert: | Oh, so you're a citizen? |
| Juan: | Yes. |
| Wingert: | Where at in Texas? |
| Juan: | Denver City. |
| Wingert: | Denver City? |
| Juan: | Yeah. It's a little town. |
| Cleveland: | You've lived in Sioux City for seven |

years?

Juan:      Uh-huh.   No, I've been in the United States for seven years.

Wingert:   Did you go down to Mexico for awhile or something?

Juan:      Well, I was born in Texas, but we moved to Mexico when I was little.

Wingert:   Okay.  So, you are a citizen.  You were born here.   What city in Mexico?

Juan:      Chihuahua.

Wingert:   Chihuahua.  You have any, uh, family that lives here?  Is that a girlfriend or a wife?

Juan:      It's my girlfriend.

Wingert:   You got a wife?

Juan:      No.

Wingert:   Where's your mom and dad? They alive?

Juan:      Huh?

Wingert:   Mom and Dad alive?

Juan:      Yeah.

Wingert:   Where do they live?

Juan:      They live here in Sioux City.

Wingert:   They live here in Sioux City?

Juan:      Uh-huh.

Wingert:   Okay.  What's their name?  What's your

|           |                          |
|-----------|--------------------------|
|           | dad's name?              |
| Juan:     | Jose.                    |
| Wingert:  | Jose . . .               |
| Juan:     | Aguilar.                 |
| Wingert:  | What is your mom's name? |
| Juan:     | Carmen.                  |
| Wingert:  | Carmen?  Where do they work at? |
| Juan:     | TurPak and Clover Leaf.  |
| Wingert:  | Which one works at TurPak? |
| Juan:     | My dad works at Clover Leaf, my mom at TurPak. |
| Wingert:  | Okay.                    |
| Cleveland: | How old do you think your dad is? |
| Juan:     | Um, 48-- no, 58.         |
| Cleveland: | 58?  How about your mom? |
| Juan:     | 48, 49.                  |
| Cleveland: | Okay.                   |
| Wingert:  | Okay.  I want to read something to you, all right?  This is before you ask [sic] any questions, you must understand.  You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for |

you before any questionings if you wish. Do you understand these rights?

Juan: Um-hmm.

Wingert: Okay. Like I said, you've been caught with a half pound of methamphetamine. And this is not a State charge, this is not a local charge. This is a United States Government charge, it's a federal charge. Okay? You're right in the middle of a drug conspiracy. We didn't just happen upon you tonight by accident. Okay? We know a lot about you. If you don't wish to answer something, don't lie about it 'cause that'll hurt you. Just say, "I don't want to talk about that right now." But if you answer something and we know that you're lying and we prove that you're lying, then you can't get any cooperation because then we don't know when you were telling the truth and when you were lying. Okay? Some attorney's gonna say, "Well, he lied here but he told the truth here, we think. Which is the truth?" Do you understand that?

Juan: (Nods head up and down.)

Wingert: Okay. The half pound of methamphetamine, where was it going?

| Juan: | Over there. |
|---|---|
| Wingert: | Over where? |
| Juan: | Where I was stopped. |
| Wingert: | Who lives there? |
| Juan: | Eric. |
| Wingert: | How long have you known Eric? |
| Juan: | Maybe three months, or more, I don't know. |

(Court's transcription from Gov't Ex. 3.)

Report and Recommendation at pp. 13-20. Upon review of the record, the court adopts all of Judge Zoss's factual findings that have not been objected to by Jose.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional

> evidence, of any portion of the magistrate judge's disposition
> to which specific written objection has been made in
> accordance with this rule.  The district judge may accept,
> reject, or modify the recommended decision, receive further
> evidence, or recommit the matter to the magistrate judge with
> instructions.

FED. R. CIV. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required.  *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*).  As noted above, Jose has filed objections to Judge Zoss's Report and Recommendation.  The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendants' motions to suppress.

## B.  Objections To Report and Recommendation

### 1.  Probable cause to search the white Ford Ranger

Jose initially objects to Judge Zoss's conclusion that Officer Mike Simons had probable cause to search the white Ford Ranger.  Jose asserts that Judge Zoss's analysis was flawed because of two erroneous factual findings.  First, Jose contends that Judge Zoss incorrectly found that Juan had told law enforcement officers after his arrest that there were drugs in  his room at his parent's house.  Second, Jose asserts that Judge Zoss erred in finding that the white Ford Ranger pickup truck matched the description of one of the vehicles that a law enforcement officer had been told was being used by Juan and

Jose in their drug trafficking enterprises. Jose argues that when this information is extracted from the analysis that Officer Simons did not have probable cause to search the white Ford Ranger pickup truck.

The court will begin its analysis by taking up Jose's objections to Judge Zoss's factual findings. The court finds from its review of the dvd recording of Juan's post-arrest interview with members of the Tri-State Drug Task Force that Juan stated that drugs had been stored at the house he shared with his parents, Jose and Jose's wife, but that at present there were no drugs there. DVD Interview at 19:50. Therefore, this objection to Judge Zoss's Report and Recommendation is sustained. With respect to Jose's second objection to Judge Zoss's factual findings, the court notes that Judge Zoss stated in his analysis that members of the Tri-State Drug Task Force had received information from a Leroy McCoy that "Juan and Jose had used a white truck in their drug dealings." Report and Recommendation at 33. Officer Simons testified that Task Force Officer Wingert had told him that McCoy had told Wingert that one of the vehicles used by the defendants was "a white smaller pickup with flames or white-colored pickup with flames." Tr. at 74. Officer Simons further testified that the white Ford Ranger pickup he observed behind the house shared by the defendants did not have flames on it but did have "a design on the side of the truck." Tr. at 74-75. Because it is clear that law enforcement authorities had been told that the defendants were employing a small white pickup truck in their drug trafficking operations, and Judge Zoss noted as much in his Report and Recommendation, this objection is overruled.

The court therefore turns to address Jose's argument that, when the objected to information is extracted from the probable cause analysis, that Officer Simons did not have probable cause to search the white Ford Ranger pickup truck. On this issue, the court agrees with Judge Zoss there was ample probable cause to search the white Ford Ranger.

Probable cause for a search exists "when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *accord United States v. Rodriguez*, 414 F.3d 837, 843 (8th Cir. 2005) (same); *United States v. Barry*, 394 F.3d 1070, 1078 (8th Cir. 2005) (same); *United States v. Brown*, 345 F.3d 574, 580 (8th Cir. 2003) (same); *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (same). Here, at the time that Officer Simons first searched the vehicle by opening the pickup truck's door, law enforcement officers assigned to the Tri-State Drug Task Force had learned the following information. First, that a drug trafficker named McCoy had told task force officers that he was purchasing his drugs from Juan Aguilar and his brother. Both brothers lived in the same house. Juan had been arrested, and methamphetamine had been found in his blue pickup truck. Juan had admitted that he and his brother had previously stored drugs in his room at the Aguilar house. Juan and Jose had used a white pickup truck in the course of their drug trafficking activities. After Juan's arrest and while in police detention, Jose and/or Jose's wife called Juan's cellular telephone on two occasions but Juan was not allowed to answer the calls. Moreover, again after Juan's arrest, a woman, later identified as Jose's wife, Emma Aguilar, was observed taking a sack with some type of object in it from the Aguilar house to the area where a white Ford Ranger was parked behind house. Emma was dressed in short sleeves despite the cold temperature that day and she quickly returned to the house without the sack. The white Ford Ranger was registered jointly to Juan's brother Jose, and Emma. Officer Simons looked into the vehicle and observed, in plain view, a sack matching the one he had seen Emma carry out to the vehicle. The sack now was empty. Under the totality of these circumstances, a reasonable law enforcement officer could have concluded there was a fair probability that there were illegal drugs in the vehicle. Thus,

there was probable cause to search the vehicle. *See Florida v. White*, 526 U.S. 559, 563-64 (1999) ("When federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband."). Therefore, Jose's objection to this portion of Judge Zoss's Report and Recommendation is denied.

### 2.    *Need for search warrant to search the white Ford Ranger*

Jose next objects to Judge Zoss's conclusion that Officer Simons was not required to obtain a search warrant for the white Ford Ranger pickup before searching it. Jose argues that the white Ford Ranger was not readily mobile because it had expired registration and was parked on private property and that because the vehicle was not readily mobile, law enforcement officers were required to obtain a search warrant prior to searching it.

Under the United States Supreme Court's "automobile exception" to the Fourth Amendment's warrant requirement, police may search a vehicle without obtaining a search warrant if the "car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). The search of the white Ford Ranger clearly falls within the rule of *Labron*. *Labron's* requirement that the vehicle be "readily mobile" is met here, notwithstanding the fact that the pickup truck was stationary and in a parking stall. Indeed, one of the two searches upheld in *Labron* was of a pickup truck parked in the driveway of a farmhouse. *Id*. at 939. The Supreme Court upheld the search of the pickup truck even though the owner and driver of the truck had already been arrested and taken into custody. *Id*. Moreover, the fact that the white Ford Ranger had expired vehicle registration tags did not render it any less readily mobile. There is no evidence in the record that the vehicle was mechanically disabled or otherwise inoperable.

Therefore, the court concludes that the search of the white Ford Ranger is not violate the Fourth Amendment. Therefore, Jose's objection to this portion of Judge Zoss's Report and Recommendation is also denied.

### 3. Canine sniff

Jose also asserts that the use of the results of a canine sniff for drugs in the white Ford Ranger did not provide probable cause to search the vehicle because it was tainted by Officer Simon's prior search of that vehicle. Because Judge Zoss did not consider the results of the canine sniff in finding probable cause, this objection is also denied.

### 4. Search of residence

Jose finally contends that the state search warrant application to search the basement residence of Jose and Emma was tainted by the failure of the officers to mention in the search warrant application that the white Ford Ranger was searched by Officer Simons prior to the drug dog alerting to the contents of that pickup truck. Jose asserts that when those portions of the search warrant application are redacted due to the alleged illegal search that the remaining information does not provide probable cause to issue a search warrant to search Jose and Emma's basement residence.

The seminal case of *Illinois v. Gates*, 462 U.S. 213 (1983), provides the standard an issuing court must follow in determining whether probable cause supports a search warrant application and, consequently, the duty of the reviewing court when considering the propriety of that determination:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238.

The question presented on review of an issuing judicial officer's determination is not whether the reviewing court would have issued the warrant based on the affidavit as presented, but whether the court which did issue the warrant had a "'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-239 (citation omitted). Thus, a reviewing court does not conduct a de novo review of the issuing judge's determination, but must instead afford it great deference. *Id.* at 236. As the United States Supreme Court explained in *Gates*:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." [*Spinelli v. United States*, 393 U.S. 410, 419, 89 S. Ct. 584, 590, 21 L.Ed. 2d 637 (1969) ]. "A grudging or negative attitude toward warrants," [*United States v. Ventresca*, 380 U.S. 102, 108, 85 S. Ct. 741, 745-46, 13 L.Ed. 2d 684 (1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.*, at 109, 85 S. Ct. at 746.

*Gates*, 462 U.S. at 236; *see also United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995).

The Eighth Circuit Court of Appeals has weighed in on this topic as well, observing that:

> Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched.

*Gladney*, 48 F.3d at 312 (quoting *United States v. Bieri*, 21 F.3d 811, 815 (8th Cir.1994));

*see also United States v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000) ("The evidence as a whole must provide a substantial basis for a finding of probable cause to support the issuance of a search warrant."); *United States v. Johnson*, 219 F.3d 790, 790 (8th Cir. 2000) ("Probable cause means a fair probability that contraband or evidence of a crime will be found in a particular place given the circumstances set forth in the affidavit.") (quoting *United States v. Tellez*, 217 F.3d 547 (8th Cir. 2000) (in turn quoting *United States v. Horn*, 187 F.3d 781 (8th Cir. 1999) (internal quotation marks omitted)). Equally on point is the observation of Justice (then Judge) Kennedy:

> For probable cause to exist, a magistrate need not determine that the evidence sought is in fact on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

*United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985), *cert. denied*, 474 U.S. 847 (1985) (emphasis added in part) (citations omitted).

Upon review of the record and Judge Zoss's Report and Recommendation, the court concludes that Judge Zoss correctly concluded that there was a substantial basis to support the state magistrate's finding of probable cause to search Jose and Emma's basement residence. The court notes that a determination of probable cause depends on a reading of the affidavit as a whole. *Gates*, 462 U.S. at 237. Viewing the affidavit in a common sense manner, the court cannot say that the issuing state magistrate did not have a substantial basis to believe that the items sought in the warrant would be found at Jose and Emma's basement residence. Because the court has previously concluded that Officer Simon's initial search was supported by probable cause, the use of the results of the drug dog's alerting to the white Ford Ranger and the results of the search of that vehicle did not

taint the search warrant application for Jose and Emma's residence. Therefore, Jose's objection to this portion of Judge Zoss's Report and Recommendation is also denied.

### III. CONCLUSION

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendants Jose Aguilar's and Juan Aguilar's motions to suppress.

**IT IS SO ORDERED.**

**DATED** this 22nd day of August, 2005.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA